**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

**UNITED STATES OF AMERICA,**

                **Plaintiff,**

**v.**                                          **Case 2:20-cr-20118-MSN**

**OSCAR GOODWIN, Jr.,**

                **Defendant.**

**REPORT AND RECOMMENDATION
ON DEFENDANT'S MOTION TO SUPPRESS**

      Before the Court is Defendant Oscar Goodwin, Jr.'s Motion to Suppress. (D.E. #20). The instant motion has been referred to the United States Magistrate Judge for Report and Recommendation. (D.E. #21). A hearing was held on the instant motion on April 30, 2021. For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Suppress be DENIED.

    **I.**    **Introduction**

      On June 23, 2020, a grand jury of this Court returned a one-count Indictment against Defendant. (D.E. #1, #2). The Indictment charges that, on or about July 10, 2019, in the Western District of Tennessee, knowing that he had previously been convicted of a crime punishable for a term exceeding one year, Defendant knowingly possessed a firearm, that is, a

Zastavia 7.62 x 39 mm rifle, and the firearm was in and affecting interstate commerce, in violation of Title 18, United States Code Section 922(g)(1).

On October 2, 2020, Defendant filed the instant Motion to Suppress. Defendant moves to suppress all evidence arising from the search of a residence and from the resulting interrogation. Defendant argues that the search was conducted without a warrant and, as such, is presumptively unreasonable. Defendant further argues that, should the Government argue that the search was performed with consent of Defendant's mother, Daisy Maclin, that any consent given was not given knowingly, intelligently, and/or voluntarily. Finally, Defendant asserts that any statements that he made should be suppressed both as violative of *Miranda v. Arizona*, 384 U.S. 436 (1966) and its progeny and as fruit of the unlawful search.

On October 30, 2020, the Government filed its Response to Defendant's Motion to Suppress. The Government asserts that it believes the evidence will demonstrate that agents with the Tennessee Bureau of Investigation ("TBI") obtained both written consent and subsequent oral consent to search the apartment from Maclin, who resided at the apartment, and that her consent was voluntarily given and not the product of coercion. The Government argues that it also believes the evidence will demonstrate that TBI agents advised Defendant of his *Miranda* rights and that he signed a form entitled Tennessee Bureau of Investigation Warnings as to Constitutional Rights. The Government asserts that TBI agents do not recall questioning Defendant at the scene but that, if he was, it would have been after he signed the waiver because he had been in continuous custody.

## II. Proposed Findings of Fact

### a. *Testimony of Special Agent Matthew Pugh*

At the hearing on the instant motion, Special Agent Matthew Pugh ("SA Pugh") of the TBI's West Tennessee Criminal Investigation Division testified on behalf of the Government that he was involved in an arrest and search that occurred on July 10, 2019 at 2227 Woods Edge Drive, Apartment 1, in Memphis, Tennessee (the "Residence"). (April 30, 2021 Hearing Transcript[1] ("Tr.") at 2:1-3, 3:8-24). SA Pugh has served with the TBI for five years and had previously served for twenty-six years with the Memphis Police Department. (Tr. at 3:12-17).

SA Pugh testified that Special Agent Charles "Chuck" Baker ("SA Baker") of the TBI was the lead agent investigating a shooting that had occurred the previous week. (Tr. at 4:2-11, 26:13, 43:6-7). SA Baker was in the process of preparing an application for the search warrant of the Residence. (Tr. at 4:4-15, 43:21-44:3). While SA Baker was doing so, deputies with the Shelby County Sheriff's Office ("SCSO") SWAT Team had begun conducting surveillance of the Residence. (Tr. at 4:4-22, 19:19-20:3). SA Baker also requested that SA Pugh and another TBI agent assist in "put[ting] an eye on the apartment." (Tr. at 4:4-7).

SA Pugh proceeded to the Residence and was coming over the hill when he observed that SCSO deputies had two people at gunpoint. (Tr. at 4:25-5:3). SA Pugh exited his vehicle and handcuffed Defendant, and his partner handcuffed the other suspect. (Tr. at 5:3-5, 5:14-19, 25:4-13). The SCSO deputies then went to the apartment door to do a "call out," which SA Pugh explains as knocking on the door and instructing everyone in the apartment to come outside. (Tr. at 5:20-22, 6:8-11). Daisy Maclin ("Maclin") opened the door at which time they performed a "protective sweep" of the apartment. (Tr. at 5:23-24, 7:1-3). Maclin and another female, Iesha

---

[1] Hearing transcript references are to an unofficial draft transcript that was provided to assist in the preparation of this Report and Recommendation.

3

Harris ("Harris"), exited the apartment and were "calm" and not visibly upset. (Tr. at 6:15-25, 47:21-25). Maclin proceeded to sit in a chair in the breezeway while the other female "stood by," and SA Pugh went to his truck to obtain a consent-to-search form. (Tr. at 5:24-6:22-23, 28:8-10, 40:5-10, 40:19-41:2). The deputies also went back to their vehicles in the parking lot. (Tr. at 41:4-11). The deputies remained in sight but were approximately fifty to sixty feet from the Residence during SA Pugh's discussion with Maclin. (Tr. at 41:9-18).

SA Pugh returned to Maclin and asked if she was the leaseholder of the apartment, and Maclin confirmed that she was. (Tr. at 6:12-14, 7:6-7). SA Pugh showed her the Consent to Search form and requested that she consent to a search of the Residence. (Tr. at 6:2-3, 7:8-9, 41:2-3). SA Pugh testified that he has obtained consent to search "hundreds" of times as a law enforcement officer. (Tr. at 10:6-10). SA Pugh allowed her to read it and explained it to her, and Maclin asked no questions. (Tr. at 7:18-24).

The Consent to Search form states that Maclin was informed of her "constitutional right not to have a search and seizure made of the premises herein mentioned . . . without a search warrant" and of her "right to refuse to consent to such a search." (Tr. at 9:2-6 & Exh. 1). It further states that her permission was being given "voluntarily and without threats or promises of any kind" and with the understanding that "any evidence found as a result of this search and seizure without a search warrant may be used as evidence . . . in a Court of Law." (Tr. at 9:15-19 & Exh. 1). Maclin was "calm" and "helpful" when presented with the Consent to Search form, and SA Pugh did not observe anything outstanding about her demeanor or coercive about her environment. (Tr. at 7:13-17, 10:11-17). SA Pugh was armed while speaking to Maclin, but he did not draw his firearm at any point during the conversation. (Tr. at 41:19-23). Maclin agreed

4

to allow a search of the Residence and signed a Consent to Search form at 4:51 p.m.  (Tr. at 7:9-10, 8:16-17, 9:20 & Exh. 1).

The search of the Residence did not proceed immediately.  (Tr. at 10:18-20).  Instead, SA Pugh proceeded to obtain consent from the other female to search a vehicle.  (Tr. at 10:22-23).  He then went to his vehicle to get his video recorder and took an "opening video of the scene and the apartment."  (Tr. at 10:23-11:1, 15:4 & Exh. 3[2] (Opening video)[3]).  SA Pugh states on the opening video that he began recording at "approximately 5:10 p.m."  (Tr. at 29:19-23, 30:11-12, 30:20-21 & Exh. 3 (Opening video) at 00:00:08-00:00:12).  From the beginning of the recording, Maclin and Harris can be seen just outside the apartment conversing in a relaxed manner.  (Exh. 3 (Opening video) at 00:00:01-00:01:51).  During this time, Maclin was sitting in a chair in the breezeway, and Harris stood beside her.  (*Id*. & Tr. at 28:8-10, 30:7-10).

SA Pugh next approached Defendant and the other male suspect, who were seated on a curb in front of the apartment building, and asked for their names and dates of birth, whether they lived at the Residence, and where they stayed the previous night.  (Tr. at 11:1-4 & Exh. 3 (Opening video) at 00:00:44-00:01:28).  He then approached Maclin, "spoke with her again on video . . . and asked her if she had given consent," to which she responded that she had.  (Tr. at 11:5-7, 11:10-15 & Exh. 3 (Opening video) at 00:01:54-00:02:07).

---

[2] At the hearing, the Assistant United States Attorney played video and audio recordings from his laptop computer and offered as Exhibit 3 a disc which purported to contain three audio files and one video file (Tr. At 55:13 – 56:24).  During the process of preparing this Report and Recommendation, the undersigned discovered that the disc contained "shortcut" files rather than the actual audio and video files.  When the hearing was originally scheduled for December 2020, the undersigned was provided a disc with three audio recordings and three video recordings.  After consultation with counsel for the United States and Mr. Goodwin and with their consent, the December 2020 disc will be substituted as Exhibit 3.

[3] Exhibit 3 contains six recordings—three audio recordings of the interviews of Defendant, Maclin, and Harris and three video recordings made before and after the search.  SA Pugh's "opening video" is identified on the disc as IR_31_Video-Consent_to_Search-2227_Woodsedge_Drive__1__Memphis_TN_Opening_7-10-2019-1.MTS ("Opening video").

After obtaining written consent, which was confirmed orally, SA Pugh entered the Residence and "did an opening video of the inside of the apartment" after which he "turned the video off and the search began." (Tr. at 11:7-9, 12:1-4 & Exh. 3 (Opening video) at 00:02:34-00:03:26). SA Pugh testified that at no point prior to the search or after it had begun did Maclin or anyone else raise any objection to the search. (Tr. at 11:19-25).

During the search, law enforcement officers "discovered a black backpack in the corner of the den that contained a firearm." (Tr. at 12:4-7, 14:19-23 & Exh. 3 (Opening video) at 00:02:48). SA Pugh testified that the weapon appeared to be an AK47. (Tr. at 13:11-12). SA Pugh also believes that the backpack contained Defendant's identification card. (Tr. at 12:7-9). SA Pugh was asked to photograph the evidence and did so. (Tr. at 12:9-10, 12:15-25 & Exh. 2). SA Pugh estimates that the photograph of the backpack was taken "some time around 5:00" and that he believes it was at 5:10; however, SA Pugh did not have access to the meta data at the hearing to confirm the exact time. (Tr. at 34:9-20 & Exh. 2).

On cross examination, SA Pugh testified that law enforcement was surveilling the Residence because SA Baker had received a tip earlier that day from a person that was inside the apartment that Defendant was in possession of a firearm in a backpack. (Tr. at 15:13-16:12, 19:15-23, 23:12-21, 24:4-14, 26:10-22). As part of their initial investigation into Defendant, law enforcement officers obtained an eAgent Report on Defendant at 1:05:58 p.m., which contained, among other things, his criminal history. (Tr. at 16:13-19:14 & Exh. 4).

SA Pugh testified that he was not certain when surveillance began but estimated that it was around noon. (Tr. at 21:25-23:3). SA Pugh testified that law enforcement knew that Defendant and the other male suspect were at the Residence because the tipster provided that

information. (Tr. at 24:1-13). SA Pugh testified that law enforcement also had a "pretty good idea" from surveillance who was inside the Residence but was not absolutely certain. (Tr. at 23:12-21, 26:6-7).

While two SWAT team members were on the scene when SA Pugh arrived, six to seven had arrived by the time they did the "call out" and Maclin and Harris exited the Residence. (Tr. at 20:14-21:1, 27:21-28:4). The SWAT team members were wearing "green tactical gear" and carrying weapons. (Tr. at 20:4-13). All six to seven deputies along with SA Pugh and another TBI agent performed the "call out." (Tr. at 25:17-26:3, 27:24-28:4). The deputies did so with "long guns" drawn. (Tr. at 25:17-26:3).

SA Pugh acknowledged that, from the time he obtained consent to search from Maclin at 4:51 p.m. until he began the opening video at 5:10 p.m., nineteen minutes had passed. (Tr. at 29:19-30:1, Exh. 1 & Exh. 3 (Opening video) at 00:00:08-00:00:12). Additionally, officers with the Memphis Police Department ("MPD") were called at 4:58 p.m. to assist. (Tr. at 31:23-33:16 & Exh. 6). SA Pugh stated that no determination had been made at that point that anyone was going to jail and that he did not remember why MPD officers were called. (Tr. at 31:23-33:16 & Exh. 6). The MPD chronology notes state "REQ 2 MPD CARS BECAUSE THEY DO NOT HAVE CAGES." (Tr. at Exh. 6).

SA Pugh also acknowledged that he had Maclin initial on the consent-to-search form that law enforcement officers could seize her blood, hair, saliva, or DNA. (Tr. 28:25-29:15 at Exh. 1). SA Pugh testified that Maclin was not under arrest but that he had her initial this portion of the consent-to-search form "just in case" they "needed it down the road." (Tr. at 28:25-29:15).

7

SA Pugh testified that he did not tell Maclin that she would be arrested if she did not consent to the search of the Residence. (Tr. at 29:12-15).

SA Pugh testified that SA Baker took a subsequent statement from Defendant and that he was not involved in doing so. (Tr. at 36:20-37:1). SA Pugh testified that it appeared that the Tennessee Bureau of Investigation Warnings as to Constitutional Rights form (the "Rights-Waiver Form") was signed at 5:28 p.m. and that it did not list the location where it was completed. (Tr. at 37:2-38:7).

SA Pugh testified that an Affidavit of Complaint was prepared charging Defendant with being a convicted felon in possession of a weapon in violation of Tennessee Code Annotated Section 39-13-1307. (Tr. at 35:6-15, 35:24-36:1 & Exh. 7). The Affidavit of Complaint does not mention consent to search the Residence. (Tr. at 36:12-17).

### b. *Testimony of Special Agent Charles Baker*

SA Baker testified on behalf of the Government that he was involved in the shooting investigation that led to Defendant's arrest and that, on the afternoon of July 10, 2019, he was at his office completing a search warrant for an apartment based upon information he had received. (Tr. at 43:18-44:3, 49:18-50:4). While doing so, he was informed by SA Pugh that he was "on the scene" at that location and had received consent to search the Residence. (Tr. at 44:3-6, 49:8-10). SA Baker stopped working, spent about ten to fifteen minutes gathering some items, and proceeded to the scene. (Tr. at 44:6-7, 49:18-21). SA Baker estimates that he arrived "right around" 5:15 to 5:20. (Tr. at 44:8-9, 49:4-7).

When SA Baker exited his vehicle, he was told that it was a "safe scene." (Tr. at 44:10-12). He testified that SA Pugh was inside the Residence at that time and that he believes that the

8

search was underway when he arrived. (Tr. at 49:12-15). Also, upon his arrival, he observed two individuals detained on a sidewalk area. (Tr. at 44:12-13). From his investigation, he knew one of the individuals to be Defendant. (Tr. at 44:13-14). SA Baker proceeded to advise Defendant of his *Miranda* rights. (Tr. at 44:14-19, 50:8-10). In doing so, SA Baker read and explained the Rights-Waiver Form to him, which he appeared to understand. (Tr. at 44:20-46:18, 50:8-10). The Rights-Waiver Form states as follows:



(Tr. at 44:20-45:24 & Exh. 8[4]). The form was signed by Defendant and SA Baker as well as another witness, it was dated July 10, 2019, and the time appears to reflect 5:28 p.m. (Tr. at 45:23-46:1 & Exh. 8).

---

[4] Exhibit not redacted in the original.

SA Baker had not questioned Defendant before advising of his *Miranda* rights and did not question him immediately thereafter. (Tr. at 46:19-47:2). Instead, SA Baker interviewed Harris and Maclin. (Tr. at 47:15-25). Harris was interviewed inside the Residence at approximately 5:37 p.m. by SA Baker and Special Agent Felicia Rutherford ("SA Rutherford") of the TBI ("SA Rutherford"). (Tr. at 47:14-25 & Exh. 3 (Maclin audio)[5] at 00:00:00-00:00:22). Maclin was also interviewed inside the Residence at approximately 5:45 p.m. by SA Baker and SA Rutherford. (Tr. at 47:14-25 & Exh. 3 (Maclin audio) at 00:00:00-00:00:18). SA Baker testified that the interviews were like "normal conversation[s]" and that Harris and Maclin were "very calm, very helpful, [and] very polite." (Tr. at 48:1-11, 48:10-22). During her interview, Maclin stated that she did not know why the officers came to the Residence that day and that it "scared the mess" out of her. (Exh. 3 at 00:01:00-00:01:06).

SA Baker and SA Rutherford's interviewed Defendant at approximately 7:00 p.m. at the TBI office in Memphis. (Tr. at 47:9-11 & Exh. 3 (Goodwin audio)[6]). SA Baker testified that he did not recall the specifics of the interview but that Defendant was asked about the firearm that was found inside the Residence and that Defendant responded that he had purchased it from a cousin or friend. (Tr. at 46:24-47:8 & Exh. 3 (Goodwin audio)).

On cross examination, SA Baker testified that the Rights-Waiver Form does not state the location at which the advice of rights was given. (Tr. at 50:21-23). When asked if it could have been done at the TBI office instead of at the scene, SA Baker testified that, if that were the case, it would have occurred at a different time. (Tr. at 51:16-19). SA Baker was also asked why he

---

[5] The audio recording of SA Baker's interview with Maclin is identified on the disc as IR_22_Daisy_Maclin_Interview.MP3 (Maclin audio).

[6] The audio recording of SA Baker's interview with Defendant is identified on the disc as IR_21_Oscar_Goodwin_Interview.MP3 (Goodwin audio).

waited an hour and a half after providing Defendant with his *Miranda* rights to interview him. (Tr. at 51:20-23). SA Baker stated that he always provides an individual with his *Miranda* rights as soon as possible to protect themselves and to protect the defendant's rights. (Tr. at 51:23-52:11). SA Baker said that this is particularly necessary because the TBI vehicles do not have "cages", so they do not transport individuals. (Tr. at 52:1-8). Thus, SA Baker testified that he did not someone outside of his control "to accidentally question that gentleman while he's being detained." (Tr. at 52:1-11).

SA Baker was also asked if almost everything had been completed when he arrived at the scene other than to interview and transport Defendant; he responded that it had not and that, in addition to providing Defendant with his *Miranda* rights, he still needed to "question individuals around the area" about what transpired prior to his arrival, look inside the apartment, and look at the firearm. (Tr. at 52:20-53:8).

SA Baker also testified that he was the agent who received the tip and that the tipster advised that he lived at the Residence and that Defendant had a gun in a backpack. (Tr. at 53:9-54:9). SA Baker was asked if he knew who was in the apartment when he received the tip, and he testified that he did not know specifically but that, based upon the information he was given, he believed that Defendant and two other individuals were there. (Tr. at 54:10-14, 54:23-55:1). Officers also became aware at a later time that there may be children inside the Residence and were planning mitigation efforts should they need to execute a search warrant. (Tr. at 54:14-55:1). SA Baker testified that law enforcement performed surveillance to try to confirm who was inside the Residence because it was a "safety issue." (Tr. at 55:2-6).

### *c. Testimony of Daisy Maclin*

Maclin testified on behalf of Defendant that, on the date of his arrest, she had been sitting at her Residence with a friend when a young man "knocked open" her window and told her "they had OJ in a truck there outside." (Tr. at 57:21-58:8, 58:20-23). Maclin stated that "OJ" is the nickname for her son, Defendant Oscar Goodwin, who had been staying at her Residence. (Tr. at 58:9-19). Maclin then went to the door and opened it. (Tr. at 58:24-25). As she did so, she "saw officers, men in Army suits, with guns draw[n]." (Tr. at 58:25-59:2). She stated that there were "about eight officers, some Army men with . . . them Army machine guns pointed toward me and they told me, they just say we need to search your house." (Tr. at 59:6-10). Maclin testified that she asked why and that she had nothing to hide but that they told her, "either we search or we['re] going to kick it in" and take her to jail. (Tr. at 59:10-23). Maclin testified that it "scared her to death." (Tr. at 59:12-16).

Maclin testified that approximately two to three minutes elapsed from the time the officers came to her door with weapons drawn and the time she was asked to consent to the search of her Residence. (Tr. at 60:7-14). Maclin stated that she consented to the search of the Residence because she felt threatened and scared and because she believed that they would kick her door in and take her to jail if she did not do so. (Tr. at 59:10-23, 60:15-20).

On cross examination, Maclin was asked about the individuals she perceived to be "Army men," and she elaborated that there were both individuals in police uniforms as well as armored officers that came to the door and were "right in front of the house on [the] side" with their guns drawn. (Tr. at 62:5-16, 64:2-13). Maclin testified that they asked her to step outside of the Residence, pushed the door open, stepped in, stepped back out, and told her that they needed to

search her house because they received a tip regarding a gun. (Tr. at 62:17-63:3). Maclin stated that an officer in "standard uniform" then threatened her and she gave consent to search the Residence. (Tr. at 63:4-23). Maclin testified that this officer did not read the form or go over it with her; instead, she stated that he just gave her a "piece of paper to sign and said it was a search warrant." (Tr. at 64:14-20). Maclin testified that she initialed and signed it but did not read it. (Tr. at 65:11-66:16, 69:17-18).

When asked about the statement she made in SA Pugh's opening video acknowledging her consent to search, Maclin testified that she did not remember that encounter. (Tr. at 66:17-67:21). After watching the video recording to refresh her recollection, Maclin testified that she was nervous and scared at that time, that she did not know what she was saying or doing, and that she simply gave him permission. (Tr. at 67:22-68:14). When asked if she informed anyone that she was scared or that she did not understand what was happening, Maclin replied that the officer should have been able to look at her and realize that. (Tr. at 68:15-21). When asked if she told anyone that she had been threatened, she replied that she did not. (Tr. at 68:22-25, 69:11-14, 69:19-22).

On redirect examination, Maclin was asked if she recalled when she signed the Rights-Waiver Form, and she testified that it was about ten to fifteen minutes earlier than 4:51 p.m. as is reflected on document. (Tr. at 70:19-23, 71:3-6). She again explained that, when the officers with weapons drawn came to her door that she was scared and did not feel like she had any choice so she told them they could search the Residence. (Tr. at 71:7-12). She testified that, when she signed the Rights-Waiver Form, officers "were still around with the guns pointed." (Tr. at 71:15-20).

### III. Proposed Analysis

The Fourth Amendment guarantees that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Fourth Amendment applies to government intrusions, *Soldal v. Cook County, Illinois*, 506. U.S. 56, 69 (1992), into areas where the person has a reasonable expectation of privacy, *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978).

#### a. *Warrantless Search of the Residence*

When the protections of the Fourth Amendment apply, a warrant is generally required to search a place or seize an item unless an exception to the warrant requirement applies. *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) (citing *United States v. McLevain*, 310 F.3d 434, 438 (6th Cir. 2002)). One of the specifically established exceptions to the warrant requirement is a search conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citations omitted). The Government bears the burden of demonstrating by a preponderance of the evidence, through clear and positive testimony, that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion. *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011) (*United States v. Canipe*, 569 F.3d 597, 602 (6th Cir.), *cert. denied*, 558 U.S 1036 (2009)). Whether the Government has met this burden is a question of fact to be decided from the totality of the circumstances. *Schneckloth*, 412 U.S. at 227.

Defendant's Motion to Suppress argues that the Government cannot meet its burden of proving that Maclin's consent to search the Residence was be freely and voluntarily given because it was given "when staring at a police officer's drawn firearm." There is directly conflicting evidence in the record on whether this was the case.

SA Pugh testified that no officer had weapons drawn when Maclin provided her consent. Specifically, he testified that, while he was armed during his conversation with Maclin, he did not have his weapon drawn. He also testified that the SCSO deputies who performed the initial protective sweep of the home with their weapons drawn had since retreated and were approximately fifty to sixty yards away when he spoke to Maclin and sought her consent. On the contrary, Maclin testified that, when she signed the Rights-Waiver form, officers were "still around with guns pointed."

Upon review, although the Court believes that Maclin is credible, there are various points of her encounter with law enforcement that she is unable to recollect in detail. Specifically, Maclin did not recall any details about the appearance of the officer who requested that she provide consent to search the Residence, she did not remember speaking to SA Pugh in his opening video, she did not recall either sitting down outside the apartment or who would have gotten her a chair to do so, and she did not recall whether her recorded interview was taken inside or outside the Residence. The Court credits her general recollection of events but her inability to recall certain details is consistent with her testimony that the situation was unexpected and frightening to her.

SA Pugh's testimony, on the other hand, did not have gaps or details which he could not recollect. This is not only consistent with approximately thirty-one years of law enforcement

experience but also with his role in the events of that day. While SA Pugh handcuffed Defendant and worked alongside SCSO to approach and secure the Residence, from that point onward, SA Pugh testified that he did routine tasks such as procure paperwork and a video camera, seek consent to search a Residence and vehicle from two females who acted calmly, and make an initial video recording. Thus, there were no ongoing or unusual stressors that would have detracted from SA Pugh's ability to focus on Maclin and recollect the process of obtaining her consent to search. Further, there has been no argument that SA Pugh is not credible or that his testimony should be discredited for any other reason. Thus, the Court RECOMMENDS that his detailed recollections have more indicia of reliability that Maclin's and that it should be accredited in full, including as to the fact that no officers with guns drawn were present when Maclin signed the Consent to Search Form.

Neither Defendant's Motion to Suppress nor Defendant's oral argument at the hearing raise any further arguments as to the adequacy of her consent. Additionally, the record reflects that Maclin signed the Consent to Search Form, which stated that it was done "voluntarily and without threats or promises of any kind" and after being informed of her constitutional rights, including her right to refuse consent to such a search. (Tr. at Exh. 1). The record further reflects that Maclin acknowledged providing her consent on SA Pugh's opening video and did not withdraw it or state any concerns or objections to it. (Tr. at Exh. 3 (Opening video)). Accordingly, it is RECOMMENDED that the warrantless search of the Residence was lawful as it was performed pursuant to the consent exception to the warrant requirement.

### b. *Miranda*

Next, Defendant's Motion to Suppress challenges the Government to demonstrate that any purported statements made by Defendant were made knowingly, intelligently, and voluntarily and were not elicited in violation of *Miranda*.

The Fifth Amendment to the United States Constitution prohibits an individual from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Under *Miranda*, an individual who is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning" must be provided information on the following "[p]rocedural safeguards" to protect his privilege against self-incrimination:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

384 U.S. at 479; *see also Duckworth v. Eagan*, 492 U.S. 195, 201 (1989). A suspect may elect to waive his *Miranda* rights if the waiver is made voluntarily, knowingly, and intelligently. 384 U.S. at 444. The inquiry into whether a proper waiver was made has "two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986). The government bears the burden of demonstrating both that the *Miranda* warnings were properly provided and that a suspect voluntarily, knowingly, and intelligently waived his rights. 384 U.S. at 479.

The undisputed evidence in the record is as follows: that SA Baker provided Defendant his *Miranda* warnings immediately upon his arrival to the scene; that Defendant executed a Rights-Waiver Form thereafter at 5:28 p.m.; that neither SA Baker nor anyone else performed a custodial interrogation of Defendant before his *Miranda* warnings were provided[7]; and, that he was not questioned until approximately 7:00 p.m. Accordingly, it is RECOMMENDED that Defendant's statements were not elicited in violation of *Miranda* and, as such, that his Fifth Amendment rights were not violated.

### c. *Fruit of the Poisonous Tree*

Defendant additionally argues that any statements he made following the search of the Residence constitute fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471 (1963). For evidence to be considered fruit of the poisonous tree, there must be a primary illegality that tainted the continuing investigation. *Id*. at 487-88. Here, Defendant alleges that the illegality is the unlawful search of the Residence. However, as it is RECOMMENDED that the search of the Residence was lawfully performed pursuant to Maclin's consent, it is further

---

[7] SA Pugh began recording his opening video at 5:10 p.m. During the first two minutes of his recording, he asked preliminary questions to Defendant and another suspect, both of whom were detained at that time. SA Baker estimates that he arrived between 5:15 p.m. and 5:20 p.m., and the Rights-Waiver Form was completed at 5:28 p.m. Although it does not appear that Defendant had been advised of his *Miranda* rights before SA Pugh asked him these questions, it is well-settled that *Miranda* warnings are not required for administrative questions such as his name, date of birth, and address. *United States v. Pacheco-Lopez*, 531 F.3d 420, 423-24 (6th Cir. 2008) (citing *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990); *United States v. Clark*, 982 F.2d 965, 968 (6th Cir. 1993)).

RECOMMENDED that Defendant's subsequent statements do not constitute fruit of the poisonous tree.

## IV. Conclusion

For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Suppress (D.E. #20) be DENIED.

**SIGNED** this 9th day of June, 2021.

s/ Charmiane G. Claxton<br>
CHARMIANE G. CLAXTON<br>
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**