**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

UNITED STATES OF AMERICA,

     Plaintiff,

v.                            Case No. 2:20-cv-20118-MSN

OSCAR GOODWIN, JR.,

     Defendant.

---

**ORDER ADOPTING IN PART THE REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO SUPPRESS
AND
DENYING DEFENDANT'S MOTION TO SUPPRESS**

---

Before the Court is the Magistrate Judge's Report and Recommendation on Defendant's Motion to Suppress (ECF No. 46) entered June 9, 2021. Defendant filed his objections on July 9, 2021 (ECF No. 55). The Government filed its response to Defendant's objections on July 23, 2021 (ECF No. 56).

For the following reasons, the Court will **ADOPT** in part the Magistrate Judge's Report and Recommendation and **DENIES** Defendant's Motion to Suppress.

**<u>STANDARD OF REVIEW</u>**

Pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Criminal Procedure 59, a district court may refer a motion to suppress to a magistrate judge for the preparation of a report and recommendation. "The magistrate judge must promptly conduct the required proceedings and enter on the record a recommendation for disposing of the matter, including any proposed findings of fact." Fed. R. Crim. P. 59(b)(1). If a party files timely objections to the recommendation, the

district court must consider those objections *de novo* and "accept, reject, or modify the recommendation." Fed. R. Crim. P. 59(b)(3). Failure to object to a magistrate judge's findings or conclusions results in waiver of those objections. Fed. R. Crim. P. 59(b)(2).

"The filing of objections to a magistrate [judge]'s report enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Thomas v. Arn*, 474 U.S. 140, 147 (1985). Therefore, objections to a magistrate judge's report must be "specific." Fed. R. Crim. P. 59(b)(2). Vague, general, or conclusory objections are improper, will not be considered by the reviewing court, and are "tantamount to a complete failure to object." *Cole v. Yukins*, 7 F. App'x 354, 356 (6th Cir. 2001); *see also Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995) ("[A] general objection to a magistrate [judge]'s report, which fails to specify the issues of contention, does not satisfy the requirement that an objection be filed. The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious."); *Aldrich v. Bock*, 327 F. Supp. 2d 743, 747 (E.D. Mich. 2004) ("An 'objection' that does nothing more than state a disagreement with a magistrate [judge]'s suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context.") The Court need not review—under a *de novo* or any other standard—those aspects of a report and recommendation to which no objection is made. *Thomas v. Arn*, 474 U.S. 140, 150–52 (1985).

## **FINDINGS OF FACT**

In her Report and Recommendation, the Magistrate Judge sets forth proposed findings of fact. (ECF No. 46 at PageID 76–86.) In his objections, Defendant makes six specific objections to the Magistrate Judge's proposed findings in a numbered paragraphs. The Court addresses each in turn below.

**1.   The Defense objects to any assertion that she [Ms. Maclin] was seated in a lawn chair with a bottle of water at the time she was presented with a consent to search form, as stated by Agent Pugh. (Docket Entry (DE) 50, Sentencing Hearing Transcript June 21, 2021 (Tr.) at 9, Ln. 12-14).**

As to Agent Pugh's testimony about the events surrounding the search of Ms. Maclin's apartment, the Magistrate Judge recommended that Agent Pugh's detailed recollections have more indicia of reliability than Ms. Maclin's.  (ECF No. 46 at PageID 89.)  The Magistrate Judge therefore recommended that Agent Pugh's testimony should be accredited in full.  (*Id.*)

Having presided over the evidentiary hearing, the Magistrate Judge "had the opportunity to view [each] witness on the stand and assess [the witness's] demeanor," *Peveler v. United States*, 269 F.3d 693, 702 (6th Cir. 2001), and thus is "in the better position to assess the credibility of witnesses" she heard during the evidentiary hearing. *United States v. Woodruff*, 830 F. Supp. 2d 390, 402 (W.D. Tenn. 2011) (Mays, J.) (quoting *United States v. Robinson*, No. 1:07–CR–1, 2007 WL 2138635, at *1 (E.D. Tenn. July 23, 2007)). "Credibility determinations of the magistrate judge who personally listened to the testimony of a witness should be accepted by a district judge unless in his *de novo* review of the record he finds a reason to question the magistrate judge's assessment." *United States v. Brown*, No. 1:07–CR–9, 2007 WL1345463, at *1 (E.D. Tenn. May 7, 2007); *see also United States v. Tyler*, 2:10-CR-20124-STA, 2011 WL2551177 (W.D. Tenn. June 27, 2011); *United States v. Tuggle*, No. 2:10–cr–20042–JPM–tmp, 2011 WL 692812, at *1 (W.D. Tenn. Feb. 18, 2011) (quoting *United States v. Freeman*, 412 F. App'x 735, 743 (6th Cir. 2010)).

Upon a *de novo* review of the record, there is some confusion as to exactly when Ms. Maclin was seated in the lawn chair.  Agent Pugh's testimony, as cited by Defendant in his objection, does not actually say that Ms. Maclin was seated in a lawn chair *at the time she signed*

*the consent to search form.*  Agent Pugh's testimony was actually in regards to Ms. Maclin's demeanor:

> Q. And can you describe their demeanor as they were being called out?
>
> A. They were calm. They came out, sat in -- Ms. Maclin sat in the lawn chair and the other girl just stood by.

(ECF No. 50 at PageID 103.)

> Agent Pugh was then asked what happened following the protective sweep:
>
> Q. All right. And then what happened? Then what did you do?
>
> A. Then I got my notebook out, walked over to Ms. Maclin, asked her if she was owner of the apartment and she said she was. I asked her for consent to search. Showed her a consent to search form. She agreed to allow us to search the apartment. She signed the consent to search form, and I called Special Agent Baker and told her that I had a written consent to search the apartment.
>
> Q. Let me stop you there. So it -- was Ms. Maclin still calm when you presented her with the consent to search?
>
> A. She was.
>
> Q. And was she -- nothing outstanding about her demeanor?
>
> A. No, sir.

(*Id.* at PageID 103–04.)

The Court acknowledges that, given the chronology of the questioning, Agent Pugh's testimony could be interpreted as saying Ms. Maclin was seated in the lawn chair prior to him presenting her with the consent to search form.  However, the following exchanges occurred with Agent Pugh during cross-examination:

> Q. Right. And so isn't it true that 19 minutes prior you had approached that door with several armed deputies in order to do the callout and then brought those women outside? Isn't that when you asked to search?
>
> A. After I went and got my notebook and they sat down.
>
> Q. You're testifying under oath that she was sitting in a chair the way it's shown in that video?

A. I don't know if she was sitting in the chair when she signed it, but at some point she sat down in the chair.

Q. Now that's 5:10 is when we saw the video, right?

A. That's correct.

Q. 4:51 is when the consent was signed, right?

A. That's correct.

Q. Okay. That's 19 minutes apart. That's a long time, right. So you're not telling this Court that she was sitting there with a bottle of water when you got the consent, are you?

A. She signed the consent at 4:51.

Q. Right. And that video was at 5:10, right?

A. That's correct.

Q. Are you trying to tell the Court that she was sitting in that chair with a bottle of water before she signed this consent? Is that what you're telling the Court?

A. No. She came out of the apartment. I went and identified her as the homeowner, the apartment owner, went and got my notebook out of the vehicle, came back with a consent, explained the consent to her. She signed it, read it, signed it at 4:51.

(ECF No. 50 at PageID 127.)

In summarizing Agent Pugh's relevant testimony, the Magistrate Judge's Report recites Agent Pugh's testimony in the order it was given as set forth above.  (ECF No. 46 at PageID 77.) To the extent this creates an inference that Ms. Maclin was seated in the lawn chair at the time she signed the consent to search form, this is not clear from the record of Agent Pugh's testimony, and Defendant's objection is therefore **SUSTAINED**.  From this Court's *de novo* review of the record, Agent Pugh's testimony reflects that deputies with the Shelby County Sheriff's Office ("SCSO") SWAT Team performed a "call out" in which they instructed everyone inside the apartment to come outside.  Ms. Maclin and another woman then exited the apartment into a breezeway.  Ms. Maclin and the other woman appeared calm.  Ms. Maclin and the other woman remained in the

breezeway while Agent Pugh went to his vehicle to get his notebook and the consent to search form. Agent Pugh returned to the breezeway, explained the consent to search form to Ms. Maclin, Ms. Maclin was given a chance to read it, and she signed it. Approximately 19 minutes later, Agent Pugh began taking an opening video of the scene and the apartment. At the beginning of this recording, Ms. Maclin can be seen just outside the apartment conversing in a relaxed manner while sitting in a chair in the breezeway. So, at some point after Ms. Maclin exited the apartment into the breezeway, but before Agent Pugh began recording his opening video 19 minutes later, Ms. Maclin sat down in a lawn chair in the breezeway outside of the apartment, but it remains unclear whether this happened before or after she signed the consent to search form. Or if it happened before she signed the consent to search form, whether she remained seated when she was presented with and then signed the form.

**2. The Defense objects to Pugh's assertions that Ms. Maclin was "calm" and not "visibly upset" and "seated in a lawn chair" at the time of signing the consent. (Tr. at 10). Note that Agent Pugh did admit that he did not read the form to her or ask her if she was able to read. Nor did he ask her if she understood the form (Tr. at 11, Ln. 1-15). Further Agent Pugh admitted on cross examination that he was aware that Ms. Maclin had stated that they had scared the mess out of her. (Tr. at 43, Ln. 10-12). Note that Ms. Maclin's audio taped statement was made an exhibit to the motion hearing. (Tr. at Exh. 3, 1:00-1:06). Note also that Ms. Maclin testified that it "scared me to death." (Tr. at 65, Ln. 25).**

This is an objection to the Magistrate Judge's credibility determination. The Magistrate Judge recommended Agent Pugh's testimony be credited in full and therefore impliedly discredited the specific details of Ms. Maclin's testimony to the extent they directly conflicted with Agent Pugh's. As set forth above, the Magistrate Judge is in the better position to assess a witness's credibility. Upon a *de novo* review of the record, this Court finds no reason to question that determination. This Court is aware that Ms. Maclin stated the events at issue here "scared the mess out of her." However, these statements were made after the consent to search form was

signed and after the search of the apartment had been completed.  According to Ms. Maclin's own

testimony, she did not tell Agent Pugh that she was scared.  (ECF No. 50 at PageID 168.)  The

objection is therefore **OVERRULED**.

> **3. The Defense objects to Pugh's assertion that he did not threaten Ms. Maclin with jail if she did not comply. In fact, the very form that the government relies on required her to agree to have blood, DNA and from the body of her person. Note Agent Pugh admitted that he got her to waive her right to refuse giving DNA just in case we "needed it down the road." (Tr. at 33, Ln. 11-12). Further the form advised her that the items taken could be used against her in a court of law. (Tr. at 13, Ln. 1-13).**

To the extent this objection challenges the veracity of Agent Pugh's testimony that he did

not threaten Ms. Maclin, it is an objection to the Magistrate Judge's credibility determination.  As

set forth above, the Magistrate Judge is in the better position to assess credibility.  This Court has

reviewed the record *de novo* and finds no reason to question the Magistrate Judge's credibility

assessment, and therefore, the objection is **OVERRULED**.  To the extent Defendant argues that

the language of the consent to search form, or the request that Ms. Maclin consent to have blood

and DNA taken was an implied threat, this Court finds such a conclusion is not supported by the

record, and that objection is **OVERRULED**.

> **4. The Defense objects to Agent Pugh's statement that there was nothing coercive about the atmosphere surrounding Ms. Maclin's "consent." (Tr. at 14, Ln. 7-10). Yet he agreed that 6 to 7 agents armed with long guns ordered her out of her apartment minutes before he obtained her signature on the form. (Tr. at 24, Ln. 20-22, Tr. at 29, Ln. 19-25, Tr. at 30, Ln. 1-6).**

The Government bears the burden of demonstrating by a preponderance of the evidence

that Ms. Maclin's consent was voluntary, unequivocal, specific, intelligently given, and not

contaminated by duress or coercion.  Whether the Government has met this burden is a question

of fact that the Court must determine from the totality of the circumstances.  The Court construes

this objection as an objection to the Magistrate Judge's proposed conclusion of law that the search

was lawfully performed pursuant to the consent exception to the warrant requirement and will

address it below.   Otherwise, to the extent the objection challenges the Magistrate Judge's credibility determination, it is **OVERRULED** for the reasons already set forth above.

> **5. The Defense objects to Agent Pugh's assertion that all the SWAT team went back to the parking lot 50 -60 yards away from Ms. Maclin at the time consent was given. (Tr.at 45, Ln. 15- 25). Note that Ms. Maclin, whose testimony was also credited stated that all of the officers remained in sight of the apartment with their weapons drawn. (Tr. at 71, Ln. 3-11, TR. at 78, Ln. 21-22).**

The Magistrate Judge recommended that Agent Pugh's testimony be credited in full.  This is a challenge to the Magistrate Judge's credibility determination.  As set forth above, the Magistrate Judge is in the better position to assess the credibility of witnesses.  Upon a *de novo* review of the record, this Court finds no reason to question the Magistrate Judge's determination. Defendant's objection is **OVERRULED**.

> **6. The Defense objects to the testimony of Agent Pugh, concerning Ms. Maclin's understanding of the consent form. It is undisputed that Agent Pugh did not read the consent form to her, did not ask her about her ability to read, and did not verbally ask her if her consent was voluntary. (Tr. at 71, Ln. 17-18, Tr10, Ln. 1-15)**

It is unclear what testimony of Agent Pugh Defendant is objecting to as the portion of the transcript cited is the testimony of Ms. Maclin.  Agent Pugh testified that he allowed Plaintiff to read the consent to search form.  (ECF No. 50 at PageID 104.)  When asked whether Ms. Maclin appeared to understand the form, Agent Pugh testified that he explained the form to Ms. Maclin, and that she did not ask any questions.  (*Id.*)  To the extent Defendant objects to the Magistrate Judge crediting this testimony, that objection is **OVERRULED**.  The Magistrate Judge is in the better position to assess the credibility of witnesses, and upon a *de novo* review of the record, this Court finds no reason to question the Magistrate Judge's determination.

Accordingly, except as set forth above regarding Defendant's objection 1, the Court accepts and **ADOPTS** the Magistrate Judge's proposed findings of fact and incorporates them as its own findings of fact.

## <u>ANALYSIS</u>

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. Warrantless searches are "per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). A warrantless search of a dwelling may be conducted "with the voluntary consent of an individual possessing authority." *Georgia v. Randolph*, 547 U.S. 103, 109 (2006); *see also Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991) ("[I]t is no doubt reasonable for the police to conduct a search once they have been permitted to do so.").

## A.    <u>Consent to Search</u>

"[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *United States v. Thomas*, 430 F.3d 274, 276 (6th Cir. 2005) (quoting *Payton v. New York*, 445 U.S. 573, 590(1980)); *see also Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) ("It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.") (internal quotations omitted). "If an officer obtains consent to search, a warrantless search does not offend the Constitution." *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008); *see also United States v. Steagald*, 451 U.S. 204, 205–06 (2000). Such consent must be voluntary and freely given. *Moon*, 513 F.3d at 537 (citing *Bumper v. North Carolina*, 391 U.S.

9

543, 548 (1968)).  "The burden of proving that a search was voluntary is on the government . . . and 'must be proved by clear and positive testimony.'" *Moon*, 513 F.3d at 537 (quoting *United States v. Scott*, 578 F.2d 1186, 1188–89 (6th Cir. 1978)). "The government's showing must satisfy the preponderance standard."  *United States v. Holland*, 522 F. App'x 265, 274 (6th Cir. 2013) (citing *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999)).

"Consent is voluntary when it is 'unequivocal, specific and intelligently given, uncontaminated by any duress or coercion.'" *Id.* (quoting *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir. 1977)).  "The government is required to show something more than 'mere acquiescence' on the part of the defendant." *Holland*, 522 F. App'x at 274 (quoting *United States v. Canipe*, 569 F.3d 597, 603 (6th Cir. 2009)).  Where the defendant alleges coercion, he "must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police." *See United States v. Crowder*, 62 F.3d 782, 787 (6th Cir. 1995); *see also United States v. Finch*, 998 F.2d 349, 356 (6th Cir. 1993) ("Coercion may involve psychological threats as well as physical threats.").

"[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Moon*, 513 F.3d at 537 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).  Relevant circumstances may include the age, intelligence, and education of the individual, whether the individual understood that she had the right to refuse consent, the use of coercive conduct by police, and whether the individual knew her constitutional rights. *Worley*, 193 F.3d at 386; *see also United States v. Frost*, 521 F. App'x 484, 488–89 (6th Cir. 2013); *United States v. Ables*, 280 F. App'x 513, 516–17 (6th Cir. 2008).  A police officer is not required to inform an individual of her right to refuse consent, but "the absence of such a warning is considered

in the totality of the circumstances analysis." *United Sates v. Cowan*, 704 F. App'x 519, 526 (6th Cir. 2017) (quoting *Moon*, 513 F.3d at 572).

Six to seven SWAT team members in "green tactical gear" with their "long guns" drawn approached Ms. Maclin's apartment and performed a "call out" and protective sweep just prior to Ms. Maclin signing the consent to search form; however, these officers had retreated and were 50-60 yards away when Agent Pugh presented the consent to search form to Ms. Maclin.  Ms. Maclin testified that multiple officers had their weapons drawn when she signed the consent to search form, but the Magistrate Judge did not credit Ms. Maclin's testimony given the more credible conflicting testimony of Agent Pugh on this issue.  Ms. Maclin was outside of her apartment in the breezeway and was not detained when she signed the consent to search form.  Although it is unclear if Ms. Maclin was standing or was seated in a lawn chair at this point, this does not significantly impact the overall analysis of whether Ms. Maclin's consent was voluntary.  Ms. Maclin testified that the incident "scared the mess out of her," but Agent Pugh's testimony reflects that Ms. Maclin was calm, and she was not visibly upset.  And Ms. Maclin's own testimony indicates that she did not express to Agent Pugh that she was fearful.  Even though Agent Pugh did not read the consent to search form to Ms. Maclin, he allowed her time to read it and explained it to her.  The consent to search form states that Ms. Maclin was informed of her constitutional right not to have a search of her apartment performed without a search warrant and of her right to refuse to consent to the search.  Additionally, even though Ms. Maclin testified that she was coerced into signing the consent to search form with threats of arrest, the Magistrate Judge credited Agent Pugh's testimony that Ms. Maclin was not threatened.  And there is nothing in the record indicating Agent Pugh used other more subtle coercive methods to get Ms. Maclin to sign the consent to search form.   Finally, in considering the totality of the circumstances, the Court notes that the search of Ms. Maclin's

apartment did not proceed immediately upon her signing the consent to search form. Instead, the search began approximately 19 minutes later. Thus, Ms. Maclin had additional time to reflect on and think about her decision to sign the consent to search form after she executed it. After this additional time, Ms. Maclin did not revoke her consent, and in fact, subsequently confirmed to Agent Pugh that she had consented to the search of her apartment. Therefore, based on the totality of the circumstances in this case, the Court finds that the Government has met its burden to show through "clear and positive testimony" that Ms. Maclin consented to a search of her apartment. Accordingly, the Court **ADOPTS** the Magistrate Judge's recommendation that the warrantless search of Ms. Maclin's apartment was lawful because it was performed pursuant to the consent exception to the warrant requirement. Defendant's objection is **OVERRULED**.

**B.**     <u>**Effect of Protective Sweep Prior to Consent to Search**</u>

Although not argued before the Magistrate Judge, Defendant now moves the Court to consider whether the protective sweep of Ms. Maclin's apartment that occurred prior to Agent Pugh obtaining Ms. Maclin's consent to search renders her subsequent consent invalid. Defendant argues that any consent obtained after officers have already entered a residence is generally invalid and cites cases such as *United States v. Chambers*, 395 F.3d 563 (6th Cir. 2005), *abrogated on other grounds by Kentucky v. King*, 563 U.S. 452 (2011), *United States v. Buchanan*, 904 F.2d 349 (6th Cir. 1990), and *United States v. Hardin*, 539 F.3d 404 (6th Cir. 2008).

*Chambers*, *Buchanan*, and *Hardin*, along with every other case cited in Defendant's objections, involve consents to search given after an initial *illegal* entry into the home. *See Chambers*, 395 F.3d at 568–70; *Buchanan*, 904 F.2d at 353–56; *Hardin*, 539 F.3d at 424; *United States v. Haynes*, 301 F.3d 669, 679–83; (6th Cir. 2002); *United States v. Gordon*, 339 F. Supp. 3d 647, 668–71 (E.D. Mich. 2018); *United States v. Matthews*, No. CR 05-10073-NG, 2006 WL

1581574, at *5–6 (D. Mass. Mar. 1, 2006); *United States v. Johnson*, Crim. Action No. 12-291, 2012 WL 5354601, at *7 (E.D. Pa. Oct. 31, 2012). Defendant, however, does not argue that the initial protective sweep of the apartment was an illegal search. Instead, Defendant argues that, assuming the entry into Ms. Maclin's apartment was a legal protective sweep, Ms. Maclin's subsequent consent was nevertheless "tainted" by the antecedent entry into her apartment. (*See* ECF No. 55 at PageID 190–91.) This Court does not find support for Defendant's position anywhere in the caselaw. As the cases cited by Defendant recite, if there is an *illegal* entry into the home, a subsequent consent to search is not valid "unless the taint of the initial entry has dissipated before the 'consents' to search were given." *Hardin*, 539 F.3d at 424 (citing *Chambers*, 395 F.3d at 569). However, where the initial entry into the home is not illegal, then there is no "taint" that must dissipate. Indeed, this conclusion is in accord with the decisions of other courts in this district that have addressed the issue. *See United States v. Davenport*, No. 2:19-cr-20229-JTF, 2020 WL 7695333, at *5 (W.D. Tenn. Dec. 28, 2020) (lawful entry into residence did not contaminate subsequent consent to search); *United States v. Twitty*, No. 08-20345, 2009 WL 2516948, at *3 (W.D. Tenn. Aug. 14, 2009) (*Chambers* inapplicable where there was no illegal entry). Accordingly, this Court finds that the protective sweep of Ms. Maclin's apartment does not invalidate her subsequent consent to search.

## C.    Whether Statements by Defendant Were Elicited in Violation of *Miranda*

The Magistrate Judge recommended that Defendant's statements were not elicited in violation of *Miranda*, and therefore, Defendant's Fifth Amendment rights were not violated. (ECF No. 46 at PageID 91.) Neither Defendant nor the Government made objections to the Magistrate Judge's recommendation. Therefore, this Court **ADOPTS** the Magistrate Judge's recommendation that Defendant's statements were not elicited in violation of *Miranda*.

D.      **Fruit of the Poisonous Tree**

Defendant's motion to suppress argued that statements he made following the search of Ms. Maclin's apartment constituted fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471 (1963).  Because the Magistrate Judge recommended that the warrantless search of Ms. Maclin's apartment was lawfully performed pursuant to the consent exception to the warrant requirement, the Magistrate Judge recommended that Defendant's subsequent statements did not constitute fruit of the poisonous tree.  (ECF No. 46 at PageID 91–92.)  Defendant did not specifically object to this recommendation, other than to say that this Court "should find that the statement made by [Defendant] should be suppressed as it too, was a product of an illegal search and seizure."  (ECF No. 55 at PageID 188.)  As set forth in Sections A and B above, this Court finds that the search of Ms. Maclin's apartment was lawful pursuant to the consent exception to the warrant requirement.  Therefore, because there is no primary illegality that would taint Defendant's subsequent statements, the Court **ADOPTS** the Magistrate Judge's recommendation that Defendant's statements do not constitute fruit of the poisonous tree.

## CONCLUSION

Upon a *de novo* review, for the reasons set forth above, the Court hereby **ADOPTS** in part the Magistrate Judge's Report and Recommendation and **DENIES** Defendant's Motion to Suppress.

**IT IS SO ORDERED**, this 16th day of September 2021.

*s/ Mark S. Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE